# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOSHUA YOUNG, | No. 4:17-CV-01351 |
| Plaintiff, | (Judge Brann) |
| v. | |
| MCDONOUGH MANUFACTURING COMPANY, | |
| Defendant. | |

## MEMORANDUM OPINION

### NOVEMBER 5, 2019

## I. BACKGROUND

Plaintiff Joshua Young was working at a Mansfield, Pennsylvania lumber mill, House Wood Products Company ("House Wood"). He suffered an unfortunate accident while using a vertical band resaw manufactured by Defendant McDonough Manufacturing Company ("McDonough").

Young is now suing McDonough under theories of negligent design and manufacturing, strict liability, and breach of warranty. McDonough has moved for summary judgment. McDonough argues that Pennsylvania's twelve-year statute of repose on actions arising from improvements to real property (42 Pa. C.S.A. § 5536; the "statute of repose") shields it from liability.

McDonough's motion for summary judgment is now ripe for disposition; for the reasons that follow, it is denied.

## II. DISCUSSION

### A. Standard of Review

I begin my analysis with the standard of review which undergirds summary judgment. "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose."[1] Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[2] "Facts that could alter the outcome are 'material facts,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[3] "A defendant meets this standard when there is an absence of evidence that rationally supports the plaintiff's case."[4] "A plaintiff, on the other hand, must point to admissible evidence that would be sufficient to show all elements of a *prima facie* case under applicable substantive law."[5] When deciding

---

[1] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

[2] Fed. R. Civ. P. 56(a).

[3] *Clark v. Modern Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993) (Hutchinson, J.) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) and *Celotex*, 477 U.S. at 322).

[4] *Clark*, 9 F.3d at 326.

[5] *Id*.

whether to grant summary judgment, a court should draw all reasonable inferences in favor of the non-moving party.[6]

"The inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits."[7] Thus, "if the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented."[8] "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."[9] "The judge's inquiry, therefore, unavoidably asks . . . 'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'"[10] The evidentiary record at trial, by rule, will typically never surpass that which was compiled during the course of discovery.

---

[6] *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

[7] *Liberty Lobby, Inc.*, 477 U.S. at 252.

[8] *Id.*

[9] *Id.*

[10] *Id.* (quoting *Schuylkill & Dauphin Imp. Co. v. Munson*, 81 U.S. 442, 447 (1871)).

"A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."[11] "Regardless of whether the moving party accompanies its summary judgment motion with affidavits, the motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied."[12]

Where the movant properly supports his motion, the nonmoving party, to avoid summary judgment, must answer by setting forth "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[13] For movants and nonmovants alike, the assertion "that a fact cannot be or is genuinely disputed" must be supported by: (i) "citing to particular parts of materials in the record" that go beyond "mere allegations"; (ii) "showing that the materials cited do not establish the absence or

---

[11] *Celotex*, 477 U.S. at 323 (internal quotations omitted).

[12] *Id*.

[13] *Liberty Lobby*, 477 U.S. at 250.

presence of a genuine dispute"; or (iii) "showing . . . that an adverse party cannot produce admissible evidence to support the fact."[14]

"When opposing summary judgment, the non-movant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'"[15] Moreover, "if a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion."[16] On a motion for summary judgment, "the court need consider only the cited materials, but it may consider other materials in the record."[17]

Finally, "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."[18] "There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a

---

[14] Fed. R. Civ. P. 56(c)(1).

[15] *Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2003) (Weis, J.).

[16] Fed. R. Civ. P. 56(e)(2).

[17] Fed. R. Civ. P. 56(c)(3).

[18] *Liberty Lobby*, 477 U.S. at 249.

verdict for that party."[19] "If the evidence is merely colorable . . . or is not significantly probative, summary judgment may be granted."[20]

### B. Undisputed Facts

With that standard outlining the Court's framework for review, I now turn to the undisputed facts of this matter.

#### 1. The Parties

McDonough is a Wisconsin domestic business corporation that has its principal place of business at 2320 Melby Street, Eau Claire, WI 54702.[21] On March 16, 2016, Young was 34 years of age and a Pennsylvania resident, residing at 5486 Main Street, Millerton, PA 16936.[22]

McDonough has been and is regularly engaged in the business of designing, assembling, manufacturing, selling, supplying, and distributing sawmill machinery. This activity includes, but is not limited to, the vertical band resaw that is the target of this litigation.[23]

#### 2. The March 16, 2016 Incident

On March 16, 2016, Young was using a 54" vertical band resaw manufactured by McDonough. While using the band resaw, Young suffered an

---

[19] *Id*.

[20] *Id*. at 249-50 (internal citations omitted).

[21] ECF No. 43-4 at ¶ 1.

[22] ECF No. 43-4 at ¶ 2.

[23] ECF No. 43-4 at ¶¶ 7-8.

accident that resulted in the traumatic amputation of four fingers of Young's dominant left hand and in the functional loss of this hand.[24]

### 3. The Accident Resaw

McDonough sold the accident resaw, identified at serial number 54-1275, to House Wood in 1977.[25] The accident resaw weighs over 10,000 pounds and is over eight feet high, six feet wide, and six feet long.[26] It sits on a concrete floor.[27]

During discovery, Irwin Gottschall (a House Wood officer), Matt Tietz (a vice president at McDonough), and Paul Uhlig (an engineer at McDonough) all provided deposition testimony on the accident resaw and how House Wood installed it in its facility. Eugene House (the owner of House Wood) also provided an affidavit on these topics.

### 4. Gottschall's Deposition Testimony

Per Gottschall, after the 1977 purchase, the accident resaw was shipped to House Wood's plant in Mansfield, Pennsylvania.[28] McDonough did not customize

---

[24] ECF No. 43-4 at ¶ 3. The parties dispute how this accident happened. *See* ECF No. 43-4 at ¶ 4; ECF No. 46-8 at ¶ 4. But how the accident happened is not material to deciding the issues McDonough raises in its motion for summary judgment.

To make it easier on the reader, the Court refers to this particular band resaw as the "accident resaw." This helps distinguish this particular resaw from other resaws that McDonough manufactured.

[25] *See* ECF No. 46-2; ECF No. 43-4 at ¶¶ 5-6.

[26] ECF No. 43-4 at ¶ 11.

[27] ECF No. 43-4 at ¶ 13.

[28] Gottschall Dep. 17:14-19.

the accident resaw in any way to fit House Wood's particular need. The accident resaw was a standard band resaw from the McDonough product line.[29]

McDonough provided specifications and directions on how House Wood should install the accident resaw.[30] The installation involved House Wood first laying templates on the concrete floor, in order to cut out a "pit" area underneath the resaw for the lower half of the accident resaw's lower wheel. Then House Wood put bolts in the concrete floor, so that the accident resaw could "sit down on the bolts."[31] This procedure was the same procedure that House Wood used to install all the band resaws that it purchased from McDonough.[32] It was all per the specifications that McDonough had provided.[33]

McDonough did not contribute to the physical work of House Wood's installation of the accident resaw.[34] McDonough did not oversee House Wood's installation of the accident resaw.[35] To Gottschall's knowledge, McDonough has not overseen the installation of any of its band resaws into House Wood's shop.[36]

---

[29] Gottschall Dep. 18:15-19.

[30] ECF No. 44-B ("Gottschall Dep.") 17:24-18:3.

[31] Gottschall Dep. 19:4-13.

[32] Gottschall Dep. 20:23-21:4.

[33] Gottschall Dep. 123:11-124:3.

[34] ECF No. 44-B ("Gottschall Dep.") 17:20-23.

[35] Gottschall Dep. 18:5-7.

[36] Gottschall Dep. 20:19-22.

### 5. Tietz's Deposition Testimony

Per Tietz, the accident resaw was not a customized model. It was a standard product that would be sold by McDonough and installed by the customer at the customer's site.[37] Tietz testified that it was McDonough's custom to send an individual to the resaw buyer's site in order to help the buyer place the machinery in the correct places, supervise installation, and provide training on how to start up and operate the machine.[38] But Tietz could not cite any documentation saying that McDonough followed this custom in dealing with the incident resaw and House Wood's installation.[39]

### 6. Uhlig's Deposition Testimony

Per Uhlig, McDonough provided House Wood with a "setting plan" that "gives the overall clearances of the machine and some instructions on how to prepare the footing for it so you can properly mount it in the mill." Though this process was "fairly complex" it also constituted a "standard installation" for a McDonough band resaw.[40] The setting plan was not customized but rather was "fairly standard" for this type of equipment.[41] It was the same engineering drawings that McDonough would provide to any other customer that was installing

---

[37] ECF No. 44-C ("Tietz Dep.") 78:23-79:6.

[38] Tietz Dep. 77:4-78:7.

[39] Tietz Dep. 80:8-13.

[40] ECF No. 44-D ("Uhlig Dep.") 42:13-24.

[41] Uhlig Dep. 125:12-18.

the same exact piece of machinery.[42] All McDonough 54" band resaws had "almost identical installations."[43]

Uhlig related that the installation process required House Wood to cut out the denoted portion of its shop's concrete floor with a saw and excavate very large holes in the floor—with the larger hole five feet wide, four feet deep, and thirty inches long as a minimum.[44] Then House Wood needed to pour concrete into the holes according to the setting plan's specifications, wait a week for the concrete to set, and then bring in "a crane or a big heavy lift" to reassemble the machine piece-by-piece.[45] This was "a typical installation that requires a great deal of earthwork."[46] Installation also required House Wood to set up the accident resaw's infrastructure: two large electrical motors, and a ventilation system that allowed suction to pull exhaust and sawdust through an exhaust pipe and out of the resaw during its operation. House Wood needed to power and wire the motors, as well as set up the ventilation system and connect it to the shop's infrastructure.[47]

Uhlig had no knowledge of whether House Wood paid for McDonough to install the accident resaw, or for just the product itself.[48] Uhlig didn't know if

---

[42] Uhlig Dep. 164:14-165:9.
[43] Uhlig Dep. 158:3-10.
[44] Uhlig Dep. 158:20-159:3.
[45] Uhlig Dep. 122:18-123:5; 158:20-160:3.
[46] Uhlig Dep. 122:19-21.
[47] Uhlig Dep. 160:13-161:10.
[48] Uhlig Dep. 123:6-20.

anyone from McDonough was involved in the installation of the accident resaw other than sending House Wood the setting plan.[49] He noted that the sales invoice for the accident resaw made no reference to any installation services being included in the sale, though that "might have been something that was verbal . . . between the customers."[50]

### 7. House's Affidavit

House provided an affidavit saying that when House Wood purchased the accident resaw in 1977, House had personal contact with Jack Kildahl, McDonough's president.[51] Kildahl told House the steps that House Wood needed to follow in installing the accident resaw. Kildahl also told House that House Wood had to follow the detailed drawings and instructions that McDonough had provided in order to complete the installation.[52]

### C. Analysis

The parties present two issues. First: whether the accident resaw was an "improvement" to House Wood's property. Second: whether McDonough falls within the class of people that the statute of repose covers.

---

[49] Uhlig Dep. 123:21-124:8.

[50] Uhlig Dep. 124:15-125:8.

[51] ECF No. 44-E ("House Affidavit") at ¶ 9. Tietz confirmed who Kildahl was in his deposition. Tietz Dep. 119:24-120:2.

[52] House Affidavit at ¶ 9.

I find that McDonough does not fall within the class of people that the statute of repose covers. I therefore can deny McDonough's motion for summary judgment on this ground alone. The Court will discuss only the second issue and not the first.

### 1. Applicable Substantive Law in Diversity Jurisdiction Cases

The Court here is exercising its diversity jurisdiction.[53] As such it must apply the substantive law of Pennsylvania, the state in which the Court sits. *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938). State law includes authoritative pronouncements from the state's highest court. *Commissioner v. Estate of Bosch*, 387 U.S. 456 (1967). If the Court does not have clear guidance from the Pennsylvania Supreme Court on a substantive legal issue, it then needs to predict how the Supreme Court would decide the issue. In this analysis, the Court will rely on persuasive decisions from Pennsylvania's intermediate appellate courts, unless it is convinced that the Pennsylvania Supreme Court would decide otherwise. *West v. American Telephone & Tel. Co.*, 311 U.S. 223, 237 (1940); *McKenna v. Ortho Pharmaceutical Corp.*, 622 F.3d 657, 660 (3d Cir. 1980).

### 2. Pennsylvania's Statute of Repose

Pennsylvania has codified its twelve-year statute of repose for improvements to real property at 42 Pa. C.S.A. § 5536. I excerpt the relevant sections below.

---

[53] *See* ECF No. 1 at ¶¶ 7-8, 27.

> [A] civil action or proceeding brought against any person lawfully performing or furnishing the design, planning, supervision or observation of construction, or construction of any improvement to real property must be commenced within 12 years after completion of construction of such improvement to recover damages for:
>
> . . . Any deficiency in the design, planning, supervision or observation of construction or construction of the improvement[; or]
>
> Injury to the person . . . arising out of such deficiency.

The parties don't dispute that the injury to Young happened over twelve years after House Wood installed the accident resaw on its property.

### 3. Whether the Statute of Repose Covers McDonough

#### a. Legal Standards

In *McConnaughey v. Bldg. Components, Inc.*,[54] a plurality of the Pennsylvania Supreme Court held that the statute of repose did not protect a manufacturer that did "nothing more than supply the component products for an improvement to real property." "The fact that a manufacturer designs and plans the component products which later are incorporated into an improvement to real property is irrelevant under the statute. The Pennsylvania statute of repose was not intended to apply to manufacturers and suppliers of products, but only to the kinds of economic actors who perform acts of 'individual expertise' akin to those commonly thought to be performed by builders."[55]

---

[54] 637 A.2d 1331 (Pa. 1994).

[55] *Id.* at 1334.

In *Noll by Noll v. Harrisburg Area YMCA*,[56] the Pennsylvania Supreme Court reinforced *McConnaughey*'s plurality holding, stating that "the proper focus in interpreting the statute was the activity performed, i.e. whether the party claiming the protection of the statute was involved in the design, planning, supervision, construction or observation of the construction of an improvement to real property."[57]  "[T]he focus of the inquiry remains on the activity performed, particularly whether any 'individual expertise' has been supplied."[58]

### b. Application

In the matter at hand, the statute of repose doesn't apply to McDonough, because McDonough didn't show a builder's variety of "individual expertise."  As I described above, McDonough played no part in House Wood's actual physical installation of the accident resaw.  It did provide detailed installation plans, to be sure, and gave House Wood instructions that it needed to follow these plans in order to correctly install the accident resaw.  But this installation process was totally standard and "off the rack"; McDonough gave it to all its resaw buyers.  Put another way, McDonough did not customize the accident resaw at all to match House Wood's individual specifications or to conform to House Wood's unique

---

[56]  643 A.2d 81 (Pa. 1994).

[57]  *Id.* at 85.

[58]  *Id.* at 86.

property. This, combined with the fact that McDonough did not supervise or help with the installation, makes it a manufacturer—not a builder.[59]

## III. CONCLUSION

For the reasons I stated above, the Court denies McDonough's motion for summary judgment.

An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
United States District Judge

---

[59] *See Cintron v. Besser Co.*, 882 F. Supp. 74, 76 (M.D. Pa. 1995) (citing *Noll* in holding that a manufacturer's activity "must have been conducted in relation to the real property," and ruling that statute of repose didn't cover manufacturer that "presented no evidence that it undertook any activity in relation to the design of that plant"); *McConnaughey v. Bldg. Components, Inc.*, 637 A.2d 1331, 1333-35 (1994) (manufacturer held liable; its product was "not manufactured to the order or specification" of plaintiffs); *see generally Freezer Storage, Inc. v. Armstrong Cork Co.*, 382 A.2d 715, 719 (Pa. 1978) (upholding constitutionality of statute of repose because, among other things, "every building is unique and far more complex than any of its component parts").

*A.M. by & through Forgione v. Landscape Structures, Inc.* is inapposite because that involved a "customized design" as opposed to a mass-produced product. No. 1:14-CV-1376, 2017 WL 2215276, at *10-16 (M.D. Pa. May 19, 2017).